IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-02206-JLK-MJW

JANET STUART SMITH, et al.,

Plaintiffs,

v.

SLIFER SMITH & FRAMPTON/VAIL ASSOCIATES, et al.,

Defendants.

---

## RECOMMENDATION REGARDING PLAINTIFFS' MOTION FOR SANCTIONS FOR DESTRUCTION OF EVIDENCE (Docket No. 74)

---

**Entered by Magistrate Judge Michael J. Watanabe**

This matter is before the court on the plaintiffs' Motion for Sanctions for
Destruction of Evidence (Docket No. 74). The court has waded through and carefully
reviewed the voluminous motion papers and exhibits thereto, namely, the subject
motion (Docket No. 74), the response (Docket No. 92), and the reply (Docket No. 106).
In addition, the court has taken judicial notice of the court's file and considered
applicable Federal Rules of Civil Procedure and case law. The court now being fully
informed makes the following findings of fact, conclusions of law, and recommendation.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court finds:

1.     That I have jurisdiction over the subject matter and over the parties
to this lawsuit;

2.      That venue is proper in the state and District of Colorado;

3.      That each party has been given a fair and adequate opportunity to be heard on this subject motion (Docket No. 74);

4.      That in this action, plaintiffs assert the following. In May 2004, one of the plaintiffs retained defendants (broker Peter Seibert and brokerage Slifer, Smith & Frampton/Vail Associates Real Estate, LLC ["SSF"]) to sell certain estate property in Vail, Colorado. The property was sold, on defendants' recommendation, on January 25, 2005, to Robert Danial for $2,846,250. On April 18, 2005, which was 83 days after the first sale, the same property was sold, with defendants again acting as broker, to Vail Resorts Development Property ("VRDC") for $7,200,000.[1] Plaintiffs' claims include breach of statutory duties as a transaction broker amounting to negligence and negligence per se for failure to exercise reasonable skill and care as a transaction broker in failing to advise, inform, and make disclosure to plaintiffs of material facts related to the transaction, including the value of the property, significant area development, the ability of plaintiffs to sell the property during the winter months, and the identity of potentially-interested buyers approached by Seibert in the course of his profession and employment with SSF and in a transaction in which he had a

---

[1] Plaintiffs note in the instant motion that VRDC is owned by Vail Resorts, Inc., which owns a 50 percent members' interest in SSF. (Docket No. 74 at 2).

financial interest. Plaintiffs also assert claims for negligent misrepresentation, fraud, and concealment. (Docket No. 12 at 2, original Scheduling Order);

5.   That plaintiffs now seek the issuance of sanctions against the defendants including the entry of default judgment and thereafter setting the matter for a damages hearing. In the alternative, plaintiffs request that the court order the sanction of adverse inference. Plaintiffs further request that the court deny the defendants' pending motion for summary judgment. Furthermore, plaintiffs request that they be allowed to amend their claims to add a claim for exemplary damages, based on the adverse inference, pursuant to § 13-12-102, C.R.S. In addition, plaintiffs move for an award of expert costs which would have been avoided had the destruction of evidence been timely disclosed to plaintiff. Finally, they seek an award of costs and attorney fees incurred in the making of this motion and all fees which would have been avoided had the destruction of evidence been timely disclosed;

6.   That defendants' arguments in response include their assertions that plaintiffs' motion is based on an expert report that exceeds the boundaries of proper expert opinion, fails to apply sound scientific and technical analysis, and is premised on a myriad of misrepresentations; that defendants' experts wholly refute plaintiffs' expert's conclusions and establish that plaintiffs' expert is wrong in

concluding that evidence was destroyed in this case; that plaintiffs'
position is groundless from a technical standpoint and also fails
factually; that spoliation of evidence cannot occur unless relevant
evidence exits in the first place; that no electronic mail or other
electronic communications occurred between the defendants and
VRDC during the relevant time period; and that plaintiffs are not
entitled to sanctions absent a showing that there is a reasonable
possibility, based on actual evidence, not wild speculation, that
evidence would have helped the plaintiffs' case existed and was
lost;

7.     That "[d]iscovery is a nondispositive matter, and magistrate judges
have the authority to order discovery sanctions." Hutchinson v.
Pfeil, 105 F.3d 562, 566 (10th Cirl. 1997).  Here, however, plaintiffs
seek dispositive relief as a sanction;

8.     That "[t]o ensure that the expansive discovery permitted by Rule
26(b)(1) does not become a futile exercise, putative litigants have a
duty to preserve documents that may be relevant to pending or
imminent litigation." Cache La Poudre Feeds, LLC v. Land
O'Lakes, Inc., 244 F.R.D. 614, 620 (D. Colo. 2007) (citing Zubulake
v. UBS Warburg, LLC, 200 F.R.D. 212, 216 (S.D.N.Y. 2003) ("the
obligation to preserve evidence arises when the party has notice
that the evidence is relevant to litigation or when a party should
have known that the evidence may be relevant to future litigation"));

9.     That "'[s]poliation' has been defined as 'the destruction or
       significant alteration of evidence, or the failure to preserve property
       for another's use as evidence in pending or reasonably foreseeable
       litigation.'" Id. (and cases cited therein);

10.    That "[t]he court has inherent power to impose sanctions for the
       destruction or loss of evidence." Id. (and cases cited therein).
       "Federal courts have authority to impose a variety of sanctions for
       spoliation including dismissal of the action." Kokins v. Teleflex Inc.,
       2007 WL 4322322, *2 (D. Colo. Dec. 6, 2007) (Miller, J.).  "When
       deciding whether to sanction a party for the spoliation of evidence,
       courts have considered a variety of factors, two of which generally
       carry the most weight: 1) the degree of culpability of the party who
       lost or destroyed the evidence; and (2) the degree of actual
       prejudice to the other party." Id. (quoting Jordan F. Miller Corp. v.
       Mid-Continent Aircraft Serv., Inc., 1998 WL 68879, *13 (10th Cir.
       Feb. 20, 1998) (unpublished)).  "[T]he destruction need not be in
       bad faith to warrant spoliation sanctions." Id.;

11.    That "[t]he movant has the burden of proving, by a preponderance
       of the evidence, that the opposing party failed to preserve evidence
       or destroyed it." Ernest v. Lockheed Martin Corp., 2008 WL
       2945608, *1 (D. Colo. July 28, 2008);

12.    That on May 19, 2006, attorney Wendell Porterfield sent defendant
       Seibert a letter in which he identified himself as counsel to the

estate of Justine H. Smith and its trustees, mentioned his understanding that Seibert obtained a listing for the Vail property from the trustees and was instrumental in setting the asking price, noted the sale on January 25, 2005, and expressed the estate's and the trustees' shock to learn the property was then sold on April 18, 2008, for a profit in excess of $4.3 million. The letter concluded by stating, "The trust and the trustees have requested that I investigate the matter. Did you have anything to do with the April 2005 sale? Do you have any knowledge why the Property was worth so much more to Vail Resorts in April 2005 than it was when the purchase price was set with the trust in late 2004? I would appreciate any information you have regarding this transaction." (Docket No. 74-2; Pls.' Ex. 1);

13. That under the specific facts of this case, defendant Seibert had an obligation as of **May 19, 2006**, to preserve non-privileged materials concerning the transaction at issue based upon attorney Wendell Porterfield's letter to Seibert on that date in which Porterfield stated that he was investigating the transaction and requested any information Seibert had regarding this transaction. (Docket No. 74-2; Pls.' Ex. 1). Under the particular circumstances presented here, preservation of such materials would not have constituted an impractical, undue burden because the sources of such materials were quite limited. In any event, all of the purported evidence

destruction occurred several months after the action was actually commenced;

14.  That this action was commenced only five and one half months later on November 2, 2006.  (Docket No. 1).  As of the commencement of this action on **November 2, 2006**, defendants unquestionably had an obligation to preserve and produce non-privileged materials that may be relevant to this litigation.  Plaintiffs are willing to concede a preservation date as late as November 2006.  (Docket No. 106 at 41);

15.  That in their motion papers, the parties have provided their own lengthy accounts of their perspectives of the course of discovery in this case, including electronically stored information ("ESI").  Those summaries provided factual background to the court.  The entire course of discovery, however, need not be summarized herein, nor do any rulings need to be made concerning any objections to any discovery demands or responses mentioned in the summaries.  Such rulings are not sought in the instant motion, and a summary of the entire course of discovery and a discussion of any disputes that arose during that course of discovery are not necessary for the court to rule on and have no bearing on the issues now before the court, namely, whether ESI was destroyed, whether any such destruction was done intentionally or in bad faith, whether sanctions should be imposed, and what sanctions, if any, should be imposed;

16. That on April 9, 2007, plaintiffs served Plaintiffs' Requests for Production of Documents ("RFP") to Peter W. Seibert, Jr. (Docket No. 74-4), and Plaintiffs' Requests for Production of Documents to Records Custodian, Slifer Smith & Frampton/Vail Associates Real Estate, LLC (Docket No. 74-5);

17. That the definition of "document" contained in both of these RFPs provided that it included "computer data, including floppy disks, hard drives, tapes and other electronic media . . . e-mails and any and all forms of communication communicating, preserving, recording and transmitting human thoughts whether written, printed, typeset or reproduced by any other means, which is now or formerly was in your possession." (Docket Nos. 74-4 at 2-3; 74-5 at 2-3);

18. That included in the RFP to Seibert was a request to "[p]roduce all documents in your possession or control, whether generated by you or provided to you by other people, that in any way references or relate to the Property including, without limitation, all E-mails . . . or documents in electronic form."  (Docket No. 74-4 at 7, ¶ 6);

19. That similarly, in the RFP to SSF was a request to "[p]roduce all documents or tangible items in your possession or control, whether generated by you or provided to you by other people, that in any way reference or relate to the Property including, without limitation, all E-mails . . . or documents in electronic form."  (Docket No. 74-5

at 7, ¶ 6);

20.    That on July 30, 2007, plaintiffs served on defendants the Plaintiffs'
Second Set of Requests for Production of Documents to
Defendants (Docket No. 74-8).  Included in that RFP were requests
for production of ESI from, to, or relating to Robert Danial,
companies controlled or operated by him, or persons employed by
or working on his behalf or of such companies; for production of
ESI from, to, or relating to any actual or potential purchase of
property by Vail Resorts or any subsidiary or company controlled or
owned in whole or in part by Vail Resorts (including VRDC); and for
inspection and sampling computers used by Seibert from January
2004 through the present and those databases identified in
discovery in this case, including any email databases, any
information or personal information management or similar program
databases, and any backup tapes or databases.  (Docket No. 74-8
at 7);

21.    That responses to the plaintiffs' first RFPs were served by Seibert
(Docket No. 74-6, Pls.' Ex. 5) and SSF (Docket No. 74-7, Pls.' Ex.
6) on May 9, 2007.  Seibert's deposition was taken on May 11,
2007.  (Docket No. 74-37, Pls.' Ex. 30).  Defendants responded to
the second RFP on September 4, 2007.  (Docket No. 74-9, Pls.' Ex.
8).  On October 15, 2007, defendants produced pursuant to the
second RFP the results of an electronic search that they had their

expert conduct, which included a CD containing a Forensic Toolkit ("FTK") report. (Docket no. 74-14, Pls.' Ex. 13). Thereafter, included in a letter from defense counsel on November 1, 2007, was a description of the sources searched for ESI, which included four media drives residing on three of Seibert's computers: SSF 1-2 and SSF 1-5 were two drives from Seiberts "Old Office PC," SSF 1-4 was from Seibert's "Home Computer," and another came from Seibert's laptop computer, SSF 1-1. (Docket No. 74-16 at 3-4);

22. That on November 12, 2007, defendants provided plaintiff with an affidavit from SSF's Information Technology Manager, Michael King. According to defense counsel, "in the affidavit, Mr. King explains the Slifer information technology environment. Based on Mr. King's affidavit, we believe that the relevant sources of electronically stored information relating to the issues in the above-referenced litigation are Mr. Seibert's personal machines and network share folder, both of which were searched as part of our disclosure . . . ." (Docket No. 74-20);

23. That Mr. King states in his affidavit, "Electronic mail data retained on the Microsoft Exchange server exits in one of three locations. . . . First, if one were seeking electronic mail messages in 2004, this data could exist within the individual broker's email account. . . . Second, the data could have been archived in an Outlook Personal Folder file (or PSI file) by an individual user and stored on that

user's own computer. . . . Third, 2004 electronic mail data could be on external media, such as an external hard drive or CD-Rom disk. An individual user could have copied electronic mail messages onto these media and retained the data." (Docket No. 74-20 at 5, ¶¶ 13-16);

24.    That in an August 20, 2007, letter, defense counsel stated, "Pursuant to the amended scheduling order in the case, we were to identify any sources of ESI not searched that may have responsive data. We do not believe that there are any sources; however, as we have advised in the past, no search was conducted of the Slifer Exchange server. The reason that no search was conducted, as Mr. King indicates in his affidavit, is because there is synchronization between Mr. Seibert's OST file, which was searched, and the Slifer Exchange server. As a result, **any potentially responsive data that may have existed on the Slifer Exchange server during the relevant period of time period would be present in Mr. Seibert's OST file** and would have been produced. Additionally, the Slifer Exchange server was not searched because the data on this server, as Mr. King represented in his affidavit, is maintained for only three days and then purged." (Docket No. 74-21 at 1-2) (emphasis added);

25.    That three computer sources that potentially could have held

relevant ESI data thus included Seibert's old office PC (SSF 1-2 and SSF 1-5), his home PC (SSF 1-4), and his laptop (SSF 1-1);

26. That the parties do not dispute that Anti Tracks software was found on Seibert's home computer (SSF 1-4) and that the drive labeled SSF 1-2, Seibert's Old Office PC- Disk 1, was not functional (See Docket No. 92 at 60);

27. That **defendants'** expert, Raphael Gorgal, stated in his report dated July 7, 2008, that the four systems were analyzed "to determine if secure deletion (wiping) software had been installed." (Docket No. 74-25 at 6). Gorgal found that "the executable files of a wiping program called Anti tracks" was on SSF-1-4, the home computer. He stated that the program's "advertised capabilities include the ability to automatically 'erase recent document history, erase Windows temp, erase run history, erase search files history, erase search computers history, erase last logon history, erase network cache, erase telnet history, erase recycle bin, erase registry streams, and clear the Windows page file.' It also offers the ability to securely delete information." (Docket No. 74-25 at 6). In addition, he reported that "[f]iles associated with the application were discovered on the drive image and have last accessed dates of **9/6/2007**. . . ." (Docket No. 74-25 at 6) (emphasis added). He further stated regarding orphaned files and folders: "9383 files and

folders **from the period 9/6/07 through 9/14/07**, as identified by Last Accessed Date were found.  These include default Windows folders including Program Files, Documents and Settings, registry entries, downloaded music from iTunes, and content from the Temporary Internet Files Folder.  Two of the orphaned files are Outlook.pst files.  **Both .PSTs were included in the original data set of searched active files.  Both are corrupt, and neither contains any whole recoverable mail data, even after being repaired using industry standard repair tools**, however, can be searched via keyword."  (Docket No. 74-25 at 9) (emphasis added).  He also stated, "SSF-1-4 is missing key components of the registry; and of those intact, some key areas are missing.  Thus, a specific/comprehensive analysis of user activity was therefore not possible.  In its current state, the imaged computer (SSF-1-4) could not boot into Windows, and the Documents and Settings folder, the Program Files folder, and Recycler are empty. . . ."  (Docket No. 74-25 at 10);

28.     That an Anti-Tracks folder was created on August 17, 2006, which was after the May 19, 2006, letter from attorney Wendell Porterfield to defendant Seibert (Docket No. 74-2; Pls.' Ex. 1);

29.     That the last-accessed date of September 6, 2007, was also after the May 19, 2006, letter from attorney Porterfield to Seibert; after

the commencement of this action on November 2, 2006 (Docket No. 1); after the entry of the original Scheduling Order in this matter (Docket No. 12); after service of the plaintiffs' first RFP to Seibert and SSF on April 9, 2007 (Docket Nos. 74-4 and 74-5); after service of the plaintiffs' second set of RFP to defendants on July 30, 2007, which included RFPs for production of ESI (Docket No. 74-8), and just two days after responses were served by defendants to that second set of RFP (Docket No. 74-9);

30.    That moreover the last-accessed date of September 6, 2007, was just eight days before defendants created a forensic bit-stream image from the computer on September 14, 2007, from which defendants' expert found 9383 orphaned files and folders from the period 9/6/07 through 9/14/07, which was days before and on the date the forensic image was created;

31.    That following the production of the defendants' expert report, which was produced after a motion to compel production of certain ESI (Docket No. 66) was filed by plaintiffs, the parties filed a Joint Motion to Amend the Scheduling and Discovery Order (Docket No. 72).  In that motion, the parties, through counsel, stated, *inter alia*, "Material Facts.  Subsequent to the filing of the Motion to Compel, Defendants endorsed and disclosed a report from their computer forensic expert, Raphael Gorgal, **showing the presence of wiping or secure deletion software called 'Anti Tracks' on and the**

**deletion of a significant number of files from a computer drive owned by Defendant Seibert which had been subject to discovery in this case**."  (Docket No. 72 at 2, ¶ 3) (emphasis added);

32.     That pursuant to an Order issued on July 18, 2008, by Judge Kane granting the Joint Motion to Amend the Scheduling and Discovery Order, plaintiffs were allowed to supplement their expert disclosures relating solely to the computer forensic examination no later than August 11, 2008, and defendants could provide any rebuttal disclosures no later than August 21, 2008 (Docket No. 73);

33.     That pursuant to that Order, plaintiff's expert, David Penrod, submitted a report in which he states that the Anti-Tracks folder "was created on August 17, 2006 at 11:11 AM.  It was deleted on September 13, 2007 at 12:13 AM, just days before Mr. Gorgal [defendants' expert] created a forensic bit-stream image from it." (Docket No. 74-28 at 4, ¶ 8).  Penrod recovered three "Internet shortcut files that link to Internet websites from which Anti-Tracks can be downloaded and information about its function obtained." (Docket No. 74-28 at 4, ¶ 12).  All three "were created on August 17, 2006 at 11:11 AM . . . .  They were deleted on September 6, 2007 at 7:44 AM.  They were Modified on August 4, 2007.  The exact cause of this modification is unknown, but may have been

caused by a visit to the Anti Tracks website on the Internet."

(Docket No. 74-28 at 5, ¶ 12);

34. That Penrod further states, *inter alia*, in his affidavit with regard to Seibert's home PC (SSF 1-4) that Penrod

> recovered evidence of secure data deletion (file wiping) on SSF 1-4, EnCase includes a utility that searches a drive image for successive, uninterrupted sectors containing well known file wiping patterns. Consecutive sectors containing such patterns were recovered during this search. . . .

> The EnCase forensic program automatically recovered a total of 67,714 folders, files and individual system data streams as Lost Files. The Affiant analyzed the date and time stamps of these objects and determined that they had been deleted as part of a systemic effort to erase pertinent data. **The erasures started on May 4, 2007 at 1:16 AM and continued every day until 11:02 AM on September 14, 2007, just before the entire operating system and its component parts was erased. Most of the erasures have the appearance of automated processes; many of those in August and September 2007, however, appear to be manual in nature**. . . .

> Files and objects deleted include but are not limited to hives and individual keys of the Windows Registry stored within System Restore Points, files and folders from the Documents and Settings directory, including Outlook PST files, and operating system data from the Windows directory. While all these deletions seriously damage forensic recovery of evidence, no deletions are more damaging than those of the Windows Registry stored within the System Restore Points. Deletion of Restore Point files obliterates historical records that can be used by the forensic analyst to construct a chronology of system and user activity. . . .

> Rafael Gorgal [defendants' expert] created a forensic bit-stream image from SSF 1-4 on September 14, 2007. . . .[2]

---

[2]Defendants' rebuttal expert, David Cowen, states that the forensic image was actually created by Evan Anderson, not Mr. Gorgal. (Docket No. 74-35 at 6).

The Affiant's analysis of EnCase's Lost Files bin revealed that two (2) Microsoft Outlook PST files had been deleted and corrupted. The Outlook PST files were both created on June 27, 2005. **The principal file (Outlook.PST) was deleted on August 3, 2007. The secondary file (OutlookHotmail-00000002.PST) was deleted on July 20, 2007. . . .**

**The Affiant's analysis of EnCase's Lost Files bin revealed that approximately 9,500 files and folders, including critical system files, had been deleted between September 6 and 14, 2007.** These files included the contents of the principal Windows operating system directories, containing critical files necessary for booting and running Windows. The contents of the following folders were deleted: Documents and Settings, Program Files, System Volume Information and Windows. . . . Documents and Settings contains User Profiles for each user with a registered logon to the computer. It also contains user created files, such as Word documents, digital photographs and email messages as well as other files such as the user's Internet History, Cache and Cookie files. This is a critical folder for forensics. It is completely empty. . . . The System Volume Information directory contains several onboard services necessary for the efficient performance and restoration of the Windows operating system. This directory is part of System restore, a tool that allows the user to set points in time to which he or she can roll back the computer. The System Volume Information folder contains these points and associated information that makes them accessible. This is a critical folder for forensics as it contains a history of the computer that can be recovered by forensic tools. This folder is completely empty. . . . The Windows directory contains the Windows operating system files. Most importantly, it contains the Windows Directory, which is a central repository for all information about the operating system and its installed software and hardware components. The Windows Directory also contains event logs, which provide a chronological record of application, system, security and user events. Both the Registry and event logs are critical to effective forensic analysis. These files are no longer present.

(Docket No. 74-28 at 5-6, ¶¶ 14-23) (emphasis added);

35. That Penrod also examined the hard drives from Seibert's office computer, SSF 1-2 (the boot drive) and 1-5. Penrod found that SSF 1-2 had been formatted on or after May 10, 2007, and he opined that the formatting was intentional because "[t]he steps in the process are too many and too complicated to be unintended. One must knowingly and purposely engage in the process to complete it." (Docket No. 74-28 at 6-7, ¶¶ 24-27). He further stated that "[f]ormatting SSF 1-2 required advanced computer knowledge and skills. Mr. Seibert has indicated in sworn testimony that he possesses only a rudimentary understanding of computers. If so, this means that somebody with greater knowledge and skills assisted Mr. Seibert in the formatting process." (Docket No. 74-28 at 7, ¶ 28);

36. That according to Penrod, through the use of a forensic program, several instances of dates in 2007 were recovered from SSF 1-2, the latest being May 10, 2007. Penrod states, "It shows that SSF 1-2 was used on May 10, 2007 at 7:43 PM to join a meeting via Webex . . . ." Penrod notes that May 10, 2007, was the day after Seibert provided a response to plaintiffs' RFP and one day before Seibert's deposition. (Docket No. 74-28 at 7, ¶ 31);

37. That pursuant to Judge Kane's Order of July 18, 2008 (Docket No. 73), defendants' rebuttal expert, David Cowan (Mr. Gorgal's co-worker), submitted a rebuttal report dated August 21, 2008.

(Docket No. 92-15, Defs.' Ex. N).  Cowan does not agree with certain conclusions stated in Penrod's report.  Cowan opines that EnCase script does not do what Penrod claims and that "[i]n fact, nowhere in the script source code does it reference, identify or test any 'well known wiping patterns'."  (Docket No. 92-15 at 4-5).  Cowan further states that "CFL [Penrod's firm] is basing their technical argument that wiping occured [sic] on SSF-1-4 and SSF-1-2 on the consecutive sector script which does not operate as has been described in Mr. Penrod's report **and does not in my opinion show that this or any drive has been wiped**."  (Docket No. 92-15 at 7) (emphasis added).  With regard to Anti-Tracks, Cowan states, *inter alia*, that a specified "recovered fragment of data contained within the .ini file indicates that no data was documented by the .ini as being erased by Anti-Tracks in the Internet, Windows, Plugins or Email categories. Our testing indicates the date 06/01/2004 is automatically entered in the [LastEraseDate] value when the .ini file is initially created.  Our testing of the application continues to determine what other files may get created in its use and this section may be supplemented in the future based on that testing."  (Docket No. 92-15 at 8).  Furthermore, Cowan states that "Penrod does not provide any technical documentation or explanation which would indicate any

automated or manual process preformed [sic] these deletions [file erasures on SSF 1-4]. Furthermore, Mr. Penrod's conclusion that the purported erasures were part of a systematic effort to erase pertinent data have not been explained so I cannot determine how he has come to these conclusions." (Docket No. 92-15 at 10);

38. That attached to defendants' response to the instant motion is a new expert report from L. Aaron Phillipp of Navigent Consulting, Inc., responding to Penrod's opinion that the defendants intentionally reformatted the data drive labeled SSF 1-2 (Seibert's old office PC - disk 2) in an effort to prevent the plaintiffs from acquiring evidence against the defendants. (Docket No. 92-16, Defs.' Ex. O). Phillipp concludes that he

> did not identify any evidence to support Mr. Penrod's assertion that Mr. Slifer's [sic] work computer was reformatted. As detailed in this report, in all cases on the SSF 1-2 hard drive, the markers which are a direct and inevitable result of formatting were either missing or damaged. In short, none of the artifacts which would indicate a proper or attempted reformatting had occurred could be identified. Rather, the state of the drive would indicate some kind of catastrophic failure, either caused by older hardware which was nearing the end of its life or some type of malware.

(Docket No. 92-16 at 15);

39. That Federal Rule of Civil Procedure 26(a)(2)(C) provides in pertinent part that "[a] party must make [expert] disclosures at the times and in the sequence that the court orders;"

40. That Phillipp's undated report was submitted on October 8, 2008,

with the defendants' response to the instant motion. It was not timely produced in accordance with Judge Kane's Order of July 18, 2008 (Docket No. 73), which required that defendants file any rebuttal expert disclosures no later than August 21, 2008. Defendants' other expert, Cowan, did not address the destruction of the data on the old office PC in his timely report dated August 21, 2008. (Docket No. 92-15, Defs.' Ex. N);

41. That Federal Rule of Civil Procedure 37(c)(1) provides in pertinent part that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002) (internal quotations omitted);

42. Defendants have not provided any explanation for why a new expert report was suddenly submitted with their response. There has been no showing that the failure to submit Phillip's report in a timely manner was substantially justified or is harmless. Therefore, such report should not be considered in conjunction with the motion now at issue;

43. That even if Phillipp's report should be considered, the conclusion

stated therein is rebutted by Penrod's subsequent declaration submitted by plaintiffs with their reply. (Docket No. 106-2). Furthermore, as correctly noted by plaintiffs in their reply, Penrod and Phillipps agree that all of the data on the old office PC was destroyed after May 10, 2007. Such loss of data could have been avoided if the data had been timely preserved by defendants. In addition, in his declaration, Penrod also methodically rebuts Cowan's August 21, 2008, report and conclusions and identifies purported misstatements in defendants' response concerning Penrod's conclusions;

44. That Seibert's August 22, 2008, deposition testimony (Docket No. 74-34) includes the following. His old office PC came from his brother in 2003 (Seibert Transcript at 17:4-7, 18:1) and remained at Seibert's office until October 2007 (20:4-10, 36:15-18). He was out of town for about 17 days in September 2007, and while he was gone, copies were made of the computer drives. (21:14-25 - 22:4). It was the primary computer he used for his work from 2003 through the summer of 2005 at which time he started using his lap top computer. (43:23-25; 44:1). After the summer of 2005, he still had that desktop PC in his office and turned it on from time to time if he was looking for a file that he could not find in his lap top computer. (44:8-13). There was no other place he kept electronic information relating to his work from the summer of 2003 through

the summer of 2005. The information from his work related to this case was contained on that computer. (54:4-12). Seibert does not know how the destruction of data on the computer occurred. (49:20-22, 50:12-15). He denies deleting or destroying any information from a computer since May 2006 that might related to this case. (17:18-22). He further denies installing, downloading, or using any wiping software on any computer. (59:18-20; 60:8-13). With regard to his home PC, from the time until it came into the house until September 2007, he had a habit of using it to check his SSF email. (71:4-9, 23-25; 72:1-8). He had access to that computer from September 6 to 8, 2007, at which time he went to Arizona. At that time his wife and two daughters were in the house, but they told him they have no knowledge about the Anti-Tracks software on the computer. (73:8-11; 75:15-18). He returned to Colorado on September 26 or 27, 2007. (73:12-15). He does not know who installed the software, and he never used it. (75:18-23);

45.     That "the general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997). "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." Id.;

46.     That "'bad faith' is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest." Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc., 244 F.R.D. at 635;

47.     That Penrod's opinions are credible, in particular: (1) that SSF 1-2 was deleted and repartitioned by human action and was done so after May 10, 2007; (2) data wiping occurred on SSF 1-4; (3) files were deleted on SSF 1-4 between May and September 2007; (4) deliberate manual deletions were made between August and September 2007 on SSF 1-4; and (5) files were actually deleted the day before SSF 1-4 was imaged by defendants' experts;

48.     That there is no smoking gun establishing who caused the loss of data on the two computers, but the evidence strongly supports the conclusion that that person was defendant Seibert or someone acting on his behalf. Nevertheless, the court finds that the plaintiffs have shown by a preponderance of the evidence that after the duty to preserve the ESI on Seibert's computers arose, the defendants failed to preserve evidence and, in fact, destroyed it in bad faith and intended to prevent disclosure of relevant evidence on Seibert's computers. This finding is primarily based upon the highly-suspect timing of the usage of Anti-Tracks on Seibert's home PC and the

timing of the destruction of the hard drive on Seibert's old office PC. The reformatting of that hard drive (SSF 1-2 - the old office PC) occurred after May 10, 2007, which coincides with the date of Seibert's first deposition on May 11, 2007, and the day after he provided responses to the plaintiffs' first set of RFP. Moreover, the last access date of the Anti-Tracks on the home PC was in early September 2007 right before the drive was to be imaged by defendants' expert for purposes of producing ESI. The inference can, and has been drawn by this court, that the timing of the destruction indicates that whoever was responsible knew that the evidence discovered would very well reveal information defendants did not want revealed. Furthermore, the timing of such destruction was after the commencement of this action, at which time the parties had an obligation to preserve such evidence;

49. That there is no evidence upon which the court can conclude that defense counsel had knowledge of the destruction of evidence prior to review of Gorgal's July 7, 2008, report;

50. That "the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction. . . . Courts must take care not to hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or

unavailable] evidence, because doing so would subvert the purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 109 (2d Cir. 2002) (internal quotations omitted). "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." Id. See Aramburu v. Boeing Co., 112 F.3d at 1407;

51.     That the plaintiffs have adduced sufficient evidence to support an inference that some of the missing data was harmful to plaintiffs. Seibert testified that the primary computer he used during the relevant period of 2004 and 2005 was his old office PC. He also used his home PC. In addition, he used the home PC to access e-mail on a regular basis while it was in his home, including e-mail from the SSF Exchange Server. The court agrees with plaintiffs that these two computers were the most important sources holding ESI relevant to the matters at issue in this case. Furthermore, there is evidence that e-mail was exchanged with Seibert concerning the property, namely, hard copies of various e-mails sent by and received by Seibert concerning the property;

52.     That plaintiffs' ability to litigate their claims has been substantially prejudiced by the defendants' failure to preserve potentially relevant

and responsive information;

53.     That defendants' failure to preserve such discovery has forced the

plaintiffs to incur considerable additional discovery expenses;

54.     That while the court finds that the destruction of evidence here was

the result of willfulness and bad faith, upon consideration of the

circumstances presented in the instant motion and the so-called

"Ehrenhaus factors,"[3] the extreme, severe sanction of a dispositive

sanction, namely, entry of default judgment (albeit tempting under

the circumstances presented here) is not recommended.  "Because

dismissal with prejudice defeats altogether a litigant's right to

access to the courts, it should be used as a weapon of last, rather

than first, resort."  Ehrenhaus v. Reynolds, 965 F.2d 916, 920 (10th

Cir. 1992) (internal quotation marks omitted).  "Only when the

aggravating factors outweigh the judicial system's strong

predisposition to resolve cases on their merits is dismissal an

appropriate sanction."  Id. at 921; and

55.     That an adverse inference instruction to the jury at trial which

instructs that the jury infer that the destroyed evidence would have

---

[3]"Before choosing dismissal as a just sanction, a court should ordinarily consider a number of factors, including (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant, . . . (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance, . . . and (5) the efficacy of lesser sanctions." Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992) (internal quotation marks and citations omitted).

been unfavorable to the defendants should be permitted. In addition, plaintiffs should be permitted to amend their claims to add a claim for exemplary damages based on the adverse inference. Furthermore, plaintiffs should be awarded their costs and attorney fees for this motion and for the additional discovery expenses incurred as a result of the defendants' failure to preserve, including compensation for the time and expense involved in the forensic examination of the computer files.

## RECOMMENDATION

**WHEREFORE**, based upon these findings of fact and conclusions of law, this court **RECOMMENDS**:

1. That plaintiffs' Motion for Sanctions for Destruction of Evidence (Docket No. 74) be **granted**;

2. That this action not be dismissed based upon the spoliation; however,

3. That an adverse inference instruction be permitted and that plaintiffs be permitted to amend their claims to add a claim for exemplary damages based on the adverse inference; and

4. That plaintiffs be awarded their attorney fees and costs (including expert costs) for this motion and for the additional discovery expenses incurred as a result of the defendants' failure to preserve, including compensation for the time and expense involved in the

forensic examination of the computer files.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.  <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Done this 12th day of January 2009.

BY THE COURT

<u>s/ Michael J. Watanabe</u>
MICHAEL J. WATANABE
U.S. MAGISTRATE JUDGE